RENDERED:  JULY 23, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0076-WC

JAMES STINES                                                    APPELLANT

PETITION FOR REVIEW OF A DECISION
v.          OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-19-85911

CTA ACOUSTICS; HONORABLE
JOHN B. COLEMAN,
ADMINISTRATIVE LAW JUDGE;
KENTUCKY WORKERS'
COMPENSATION BOARD; AND
STRATEGIC COMP/ GREAT                                          APPELLEES
AMERICAN ALLIANCE
INSURANCE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  JONES, MAZE, AND L. THOMPSON, JUDGES.

MAZE, JUDGE:  James Stines petitions for review of a decision of the Workers'

Compensation Board (the Board) which affirmed the decision of an administrative

law judge (ALJ) denying Stines' claim for permanent partial disability benefits. Because the ALJ's decision is supported by substantial evidence, we affirm.

Stines began working for CTA Acoustics (CTA) in 2000, with his most recent position being in the maintenance department. On March 19, 2019, Stines was on all fours cleaning up an oil spill when he felt a burning sensation in his back. Stines was able to work only a few hours the next day and sought medical treatment. He has never returned to work. Pursuant to company policy, he was terminated by CTA after being off work for three months.

In an April 1, 2019, letter, Dr. William Lester stated he had reviewed an MRI and concluded Stines had "degenerative disc disease at multiple levels with developmental component of central stenosis[1] which in my opinion is preexisting." Record (R.) at 153. Dr. Lester also opined that Stines' "mechanism of injury does not support the signs and symptoms he is currently exhibiting." *Id.* Stines saw Dr. Robert Hoskins in August 2019, who diagnosed a disc herniation, lumbar spondylosis, congenital lumbar central canal stenosis, and left lumbar radiculopathy.[2]

---

[1] *Stenosis* means "a narrowing or constriction of the diameter of a bodily passage or orifice[.]" https://www.merriam-webster.com/dictionary/stenosis#medicalDictionary (last visited June 30, 2021).

[2] *Spondylosis* means "any of various degenerative diseases of the spine[.]" https://www.merriam-webster.com/medical/spondylosis (last visited June 30, 2021). *Radiculopathy* means "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or

Dr. Hoskins also opined that:

> Working for a prolonged period of time in a stooped/twisted posture subjected Mr. Stines' lumbrosacral spine to mechanical forces that exceeded the threshold for safe loading and caused injury. Mr. Stines did have underlying congenital lumbar central canal stenosis, but this condition was dormant and non-disabling at the time of the events at work on 03-19-19. At a bare minimum, the events at work on 03-19-19 aroused Mr. Stines' condition into an active state and transformed it into a disabling reality.

R. at 10. Dr. Hoskins assigned Stines a 13% impairment rating and checked a box denoting that Stines did not have a preexisting active impairment.

Stines filed an application for workers' compensation benefits in December 2019, listing a March 19, 2019, date of injury caused by "strain or injury by repetitive motion[.]" R. at 3 (capitalization omitted). On the attached medical history, Stines noted he had been seen by Grace Health in February 2019 for flu and high blood pressure.[3]

Grace Health's records of its treatment of Stines were later introduced. Those records note that Stines went to Grace Health on February 12, 2019, for kidney pain and back and neck pain. Crucially, the notes for that visit

---

weakness in the part of the body which is supplied with nerves from that root[.]" https://www.merriam-webster.com/dictionary/radiculopathy (last visited June 30, 2021).

[3] Though Stines signed the accompanying medical history and employment history forms, he did not sign the application for benefits. No party has raised that omission as an issue, so we decline to address it further.

state that Stines had an onset of back pain "2 months ago[,]" which was an "ache" which "occurs rarely" and is in his "middle back and bilateral" without "radiation of pain." R. at 178. Stines had a follow-up appointment at Grace Health later in February 2019. The report of that visit does not mention kidney pain. Instead, it states that Stines had an onset of back pain "4 months ago. The problem is stable. It occurs intermittently. Location of pain is middle back and R & L thoracic/lumbar area. There is no radiation of pain. The patient describes the pain as an ache. Context: no injury. Symptoms are aggravated by lifting, pushing, standing and walking." R. at 174.

Dr. Timir Banerjee, a neurosurgeon, reviewed Stines' medical records and performed an independent medical examination of Stines on February 14, 2020. Dr. Banerjee posited that Dr. Hoskins must not have known about Stines' visits to Grace Health for back pain before assigning him a 13% impairment rating. Dr. Banerjee did not believe Stines "had sustained any harmful change to the human organism from the episode of 3/19/19. However, he did have complaint of back pain possibly from strain of Erector Spinae muscle . . . ."[4] R. at 197. Dr. Banerjee then stated the following opinions:

---

[4] *Erector spinae* is defined simply as "sacrospinalis[.]" https://www.merriam-webster.com/medical/erector%20spinae (last visited June 30, 2021). *Sacrospinalis* is defined as "a muscle that extends the length of the back and neck, that arises from the iliac crest, the sacrum, and the lumbar and two lower thoracic vertebrae, and that splits in the upper lumbar region into three divisions of which the lateral is made up of the three iliocostalis muscles, the intermediate is made up of the three longissimus muscles, and the medial is made up of the three

B.  He has preexisting active impairment of the back from at least three to four weeks prior to the work episode in question.  It could be longer[,] 2-4 months[,] depending on as to [sic] which history is considered to be accurate . . . .  This would give him 5-8% active impairment . . . .

C.  He does not need any surgery (discectomy or fusion) related to the L5-S1 findings—annular tear is not a traumatic event—it is part of degeneration in evolutions—disc being like layers of onion and progressive rotting from outside causing bulging from loss of water from genetic and inflammatory damage . . . .  The disc protrusion is degeneration[5] in evolution.  He has no motor, sensory or reflex change and there are several non-anatomical findings suggesting pain behavior . . . .

D.  I do not agree with 13% impairment . . . .

E.  He has reached MMI [maximum medical improvement] . . . .  I think as of [sic] April 1, 2019 should be considered MMI for the episode in question and the subsequent discomfort is related to active impairment.

F.  He has no cervical injury.  He had complained of cervical pain in February.  He has zero percent impairment for lumbar injury related to the "oil spill cleaning" . . . .

H.  He does not need any medical, surgical or chiropractic treatment for the issue in question.

---

spinalis muscles[.]"  https://www.merriam-webster.com/medical/sacrospinalis (last visited June 30, 2021).

[5] *Degeneration* in this context means "deterioration of a tissue or an organ in which its vitality is diminished or its structure impaired[.]"  https://www.merriam-webster.com/dictionary/degeneration#medicalDictionary (last visited June 30, 2021).

R. at 197-98 (emphasis omitted). In April 2020, Dr. Banerjee prepared a supplemental report, essentially reiterating his conclusions.

Stines was deposed in February 2020 and answered "not that I can recall" when asked if he had experienced lower back problems prior to the March 2019 work incident. R. at 234. When counsel mentioned the Grace Health records, Stines disjointedly stated "where I had—I was thinking I had a kidney infection or a UTI or something. It was—it was my spine back. It was like right here (Indicating). My kidneys, maybe." R. at 234. But when asked what treatment he received for his kidneys, Stines said "I don't really remember" because "it's been so long ago . . . ." R. at 235. Finally, Stines gave an incohesive response when asked if he had been experiencing back pain at the time he visited Grace Health: "No, not—no, not that I can recall. I mean, it says back pain, but I—you know, I think from here (Indicating) back to the back, you know . . . ." R. at 237. When asked by his own counsel the location of his current back pain, Stines answered "[w]ell, it's way down lower and in the center, like, spine area. And that's way different." R. at 250.

CTA introduced a March 3, 2020, letter from Dr. Richard Suss, a neuroradiologist. Dr. Suss opined that imaging performed in March 2019 which he reviewed did not show "evidence of acute or traumatic pathology or aggravation or

of anything that can be attributed in reasonable medical probability to events on a particular date such as March 19, 2019." R. at 328-29.

In April 2020, Dr. Hoskins was deposed and he reiterated his conclusion that "[a]t a bare minimum, the events at work on 3/19/19 aroused Mr. Stines' condition into an active state and transformed it into a disabling reality." R. at 358. Later, the following colloquy occurred:

> Q All right. Is this the type of job that can result in cumulative trauma to the back?
>
> A I believe it is.
>
> Q Okay. Is there a relationship then between his work and the degenerative disc disease that was going on in his back?
>
> A Let me look back and see if we absolutely had that diagnosis that—an MRI scan can be read from various—okay. He did— it does say "multilevel degenerative disc disease" so I would say within best medical probability, there is a relation between his job and the moderate—I'm sorry, the multilevel degenerative disc disease.

R. at 365.

The benefit review conference order notes that Stines claimed a specific injury on March 19, 2019, and cumulative trauma.[6] R. at 440. The matter progressed to a final hearing, at which Stines was asked:

---

[6] Stines' counsel stated that order was correct when asked by the ALJ at the final hearing if he wanted to make any clarifications or changes. R. at 510. But in his petition for review, Stines alleges the ALJ and Board "have misunderstood the gravamen" of his claims" by "portray[ing] [his] arguments as being based upon alternative and divergent theories. Their rulings consider

-7-

Q What were your problems when you went to Grace Health in February of 2019?

A I think I went a couple of times. I'm not exactly sure, but I went a couple of times. And once was—the first time I went was just to establish care. And I went to—I had a kidney infection. I thought it was a kidney infection. I don't know what it was, but yeah, it was kidney related.

Q Okay. Can you compare the pain you were having then with the pain you had in your work-related injury?

A Oh, there was no—a total difference. You know, the kidney is on the outside. I used to fight and be a boxer. You know, when you get a kidney shot, you know that's a kidney shot. But, you know, this is spine. I mean, there's way difference in the spine and the kidney. I mean, anybody could tell.

Q Okay.

A Same area but, you know, it's upper lumbar.

R. at 529.

In August 2020, the ALJ issued his decision. After describing the evidence, the ALJ concluded that Stines was entitled to only temporary total disability payments. The ALJ concluded he did not find Dr. Hoskins' opinions persuasive because he had not been aware of Stines' visits to Grace Health. The

---

Mr. Stines' injury as separate and distinct from the repetitive physical stress inherent to the work history." Petition for review, p. 1. Contrary to Stines' newfound argument, the benefit review conference order plainly supports the conclusion that Stines was pursuing both theories, and counsel affirmed the correctness of that order at the final hearing before the ALJ.

-8-

ALJ also found that Stines' testimony about his Grace Health visits was "vague" and his failure to mention complaining about back pain at Grace Health on his medical history form "leaves the inference" that he "did not want to disclose a prior history of back pain when seeking treatment or evaluation for the alleged work injury." R. at 558-59. The ALJ found that there was not "persuasive medical evidence to support [Stines'] allegation of impairment as the result of cumulative trauma." R. at 560. After the ALJ denied Stines' motion for reconsideration, Stines appealed to the Board. After the Board affirmed the ALJ, Stines filed this petition for review.

We begin by reiterating the familiar standards of our review in workers' compensation cases. "The ALJ has the sole discretion to determine the quality, character, and substance of the evidence and may reject any testimony and believe or disbelieve various parts of the evidence regardless of whether it comes from the same witness or the same party's proof." *GSI Commerce v. Thompson*, 409 S.W.3d 361, 364 (Ky. App. 2012). Because Stines, who had the burden of proving each of the essential elements of his claim and carried the risk of non-persuasion, was unsuccessful before the ALJ the question is whether the evidence compels a different result. *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735, 736 (Ky. App. 1984). "In order to rise to the level of compelling evidence, and thereby justify reversal of the ALJ under this circumstance, the evidence must be so

overwhelming that no reasonable person could reach the same conclusion as did the ALJ." *Groce v. VanMeter Contracting, Inc.*, 539 S.W.3d 677, 682 (Ky. 2018) (citations omitted). In other words, the evidence does not compel a contrary result if the ALJ's decision "is supported by any evidence of substance . . . ." *Id.* Further, "[w]hen reviewing the Board's decision, we reverse only where it has overlooked or misconstrued controlling law or so flagrantly erred in evaluating the evidence that it has caused gross injustice." *GSI Commerce*, 409 S.W.3d at 364 (citing *Western Baptist Hospital v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992)). With these stringent standards in mind, we turn to the issues raised by Stines.

It appears as if Stines has largely forsaken his acute injury claim, but to the extent he has not, the ALJ's decision must be affirmed. An "injury" is statutorily defined at Kentucky Revised Statutes (KRS) 342.0011(1) as "any work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism . . . ." Dr. Banerjee expressly found that Stines had not sustained any harmful change to the human organism on March 19, 2019 (*i.e.*, had not suffered a work-related "injury"). Thus, there was substantial evidence to support the ALJ's denial of Stines' acute injury claim.

Turning to the cumulative trauma claim, Stines stresses what he deems to be the unrebutted opinion of Dr. Hoskins–especially Dr. Hoskins'

-10-

opinion that Stines' "underlying congenital lumbar central canal stenosis . . . was dormant and non-disabling at the time of the events at work on 03-19-19" so "[a]t a bare minimum, the events at work on 03-19-19 aroused Mr. Stines' condition into an active state and transformed it into a disabling reality."  R. at 10.

However, the ALJ was not required to accept Dr. Hoskins' conclusion(s).  First, Dr. Hoskins was unaware that Stines had complained of preexisting back pain at Grace Health soon before the March 2019 incident at work.  Though Stines attempts to minimize it, Dr. Hoskins' lack of knowledge of Stines' relevant medical history was significant.  Our Supreme Court has quoted with approval a decision of the Board which held in relevant part that:

> where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being substantially inaccurate or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence. Medical opinion predicated upon such erroneous or deficient information that is completely unsupported by any other credible evidence can never, in our view, be reasonably probable.

*Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839, 842 (Ky. 2004).  *See also GSI Commerce*, 409 S.W.3d at 364 ("In *Cepero*, there was a ***complete omission*** of a significant and clearly relevant past injury, misleading the medical expert to find the claimant's injury to be entirely work-related.").

-11-

The overarching issue here is, at its core, whether Stines sustained a permanent, compensable injury to his back at work. Dr. Hoskins, upon whose causation and concomitant impairment rating opinion Stines' claim primarily rests, did not know Stines' complete medical history, including seeking medical treatment *for back pain* about a month before the incident at work. Additionally, Dr. Hoskins testified at his deposition that he had not reviewed a July 31, 2019, note from Dr. William Brooks, a neurosurgeon, which stated that he did not see a need for Stines to undergo surgery. Dr. Hoskins' failure to review that note from Dr. Brooks is important as a previous note from Dr. Brooks in which he indicated Stines might need surgery was an important component of Dr. Hoskins' impairment rating for Stines.[7]

Perhaps Dr. Hoskins would have found all that information relevant. Perhaps not. But it is logically inescapable that Dr. Hoskins' opinion was based upon inaccurate, or at least incomplete, information. And Stines points to no other

---

[7] Specifically, Dr. Brooks' June 20, 2019, note states that Stines "may well require surgical intervention." R. at 14. But, after Stines had undergone additional testing/imaging, on July 31, 2019, Dr. Brooks wrote: "However I do not see a focal area that would require surgical intervention . . . ." R. at 417. At his deposition, Dr. Hoskins testified that Stines' impairment rating was 10 to 13% but "[s]ince Dr. Brooks is contemplating and seems to suggest surgery, I believe that puts him at a 13 percent." R. at 359. When asked on cross-examination, Dr. Hoskins was unsure if he had seen Dr. Brooks' July 31, 2019, note but admitted there was a discrepancy regarding a need for surgery between Dr. Brooks' June 2019 and July 2019 notes. R. at 367-68.

medical opinions which support Dr. Hoskins' conclusions. Thus, pursuant to *Cepero*, the ALJ was permitted to disregard Dr. Hoskins' opinion(s).

Stines' medical history attached to his application for benefits makes *no mention whatsoever* of having sought treatment for back pain at Grace Health. Instead, that history refers *only* to his having sought treatment at Grace Health for flu and high blood pressure. Consequently, the ALJ reasonably inferred that Stines did not want to disclose his prior history of back pain.

Second, Stines' argument to the contrary notwithstanding, Dr. Hoskins' conclusion that Stines had a dormant condition which was brought into disabling reality by the March 2019 incident was not wholly unrebutted. Dr. Banerjee found that Stines had a preexisting *active* back condition, and Dr. Lester opined that Stines had a preexisting condition and "[h]is mechanism of injury does not support the signs and symptoms he is currently exhibiting." R. at 153. And, after reviewing imaging, Dr. Suss found no evidence "of acute or traumatic pathology or aggravation or of anything that can be attributed in reasonable medical probability to events on a particular date such as March 19, 2019." R. at 330. Consequently, even if Dr. Hoskins' opinion(s) had not been fatally flawed, the evidence would not compel a conclusion that Stines had a dormant condition brought into disabling reality by the March 2019 incident at work.

Finally, the issue of a dormant condition brought into disabling reality is intertwined with Stines' contention that the ALJ and Board misapplied the burden of proof and failed to follow our decision in *Finley v. DBM Technologies*, 217 S.W.3d 261 (Ky. App. 2007). Of course, as the claimant, Stines "ha[d] the burden of proving every element of his claim." *Wilkerson v. Kimball International, Inc.*, 585 S.W.3d 231, 235 (Ky. 2019). For the reasons previously discussed, the ALJ's conclusion that Stines had not met his burden to show a permanent compensable injury was supported by substantial evidence.

Which leads us to Stines' argument that the ALJ and Board misconstrued *Finley*. Our opinion in *Finley* was aimed at providing a framework for analyzing situations when a worker's preexisting condition is aroused by a work-related incident. In *Finley*, the worker's congenital scoliosis was dormant but aroused into disabling reality by an incident at work. *Finley*, 217 S.W.3d at 262. The ALJ found ten percent of the worker's impairment to be work-related with the remainder being nonwork-related. *Id.* at 264. After the Board affirmed, the worker filed a petition for review, asserting that "the permanent impairment and medical expenses directly attributable to her congenital scoliosis are compensable" because "her congenital scoliosis constitutes a pre-existing dormant condition that was permanently aroused into a disabling reality by the work-related

injury; thus, any permanent impairment or medical expense incurred as a result of such arousal is compensable." *Id.*

We began our analysis in *Finley* by noting that "[i]t is well-established that the work-related arousal of a pre-existing dormant condition into disabling reality is compensable." *Id.* at 265. But, of course, an employer is not responsible for benefits stemming from a preexisting, active nonwork-related condition. *See, e.g.*, *McNutt Construction/First General Services v. Scott*, 40 S.W.3d 854, 859 (Ky. 2001) (holding that "only those harmful changes which are proximately caused by work-related trauma are compensable pursuant to Chapter 342."). Thus, when a worker has a preexisting nonwork-related condition, it is crucial to determine whether that condition was active or dormant at the time of the work-related incident. Toward that end, in *Finley* we quoted with approval a decision of the Board which held that "[t]o be characterized as active, an underlying pre-existing condition must be symptomatic *and* impairment ratable pursuant to the AMA *Guides* immediately prior to the occurrence of the work-related injury. Moreover, the burden of proving the existence of a pre-existing condition falls upon the employer." *Finley*, 217 S.W.3d at 265.

We thus held that in situations involving a work-related injury to a worker with preexisting nonwork-related conditions, the ALJ must find whether the preexisting condition was dormant and was temporarily or permanently

aroused by the work-related injury. *Id.* at 266. And placing the burden on the employer to show that the worker had an active preexisting condition is proper because the employer is not responsible for injuries wholly unrelated to work (*i.e.*, impairment stemming from an active, nonwork-related condition).

With that background of *Finley* in mind, we return to the facts and arguments at hand. Stines, as we construe it, makes a two-part argument. First, he contends the ALJ failed to conduct a *Finley* analysis. Second, he contends the ALJ failed to place the burden on CTA to show that at least some of Stines' impairment stemmed from an active, nonwork-related condition.

We disagree. The ALJ did not find that Stines had any permanent impairment. Accordingly, the ALJ was not required to conduct a *Finley* analysis. *See Wetherby v. Amazon.com*, 580 S.W.3d 521, 527 (Ky. 2019) (quoting *Finley*, 217 S.W.3d at 265) (emphasis added by *Wetherby*) (holding that "for a dormant condition to produce a compensable claim 'all of the employee's permanent impairment [must be] **medically determined** to have arisen after that event,' *i.e.,* the current work injury.").[8] Consequently, the burden never shifted to CTA to

---

[8] The same core conclusion has been reached in multiple unpublished cases. We cite some of those cases, only as an illustration. *See, e.g.*, *Preston v. Marco Indus. Tire Co.*, No. 2013-SC-000488-WC, 2014 WL 4656815, at *3 (Ky. Sep. 18, 2014) ("Further, as held by the Board and affirmed by the Court of Appeals, the ALJ did not need to apply *Finley* to Preston's lumbar spine condition. As stated above, *Finley* applies when a pre-existing dormant condition is aroused into a disabling condition as a result of a work-related injury. 217 S.W.3d 265. Here the ALaJ [sic] found that the work-related trauma Preston suffered was temporary and did not cause any permanent damage to her lumbar spine. Thus, the ALaJ [sic] did not need to apply the law

-16-

show that Stines had a preexisting active condition at the time of the March 2019 incident.

For the foregoing reasons, the opinion of the Workers' Compensation Board is affirmed.

ALL CONCUR.

| | |
|---|---|
| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE CTA ACOUSTICS: |
| John F. Kelley, Jr.<br>London, Kentucky | Felicia A. Snyder<br>Lexington, Kentucky |

---

regarding pre-existing conditions, because he found her work-related falls had no permanent disabling effect on that condition."); *Currens v. RJ Insulation*, No. 2019-CA-000105-WC, 2020 WL 2790419, at *8 (Ky. App. May 29, 2020) ("As the Board correctly recognized, 'a finding of a temporary work-injury is not the equivalent to a finding of a pre-existing active condition and does not necessitate an analysis under *Finley*.'"); *Zoeller v. Amazon*, No. 2018-CA-001511-WC, 2019 WL 2563168, at *6 (Ky. App. June 21, 2019) ("Under *Finley*, 'When a pre-existing dormant condition is aroused into disabling reality by a work-related injury, any impairment or medical expense related solely to the pre-existing condition is compensable.' *Finley*, 217 S.W.3d at 265. Here, the pre-existing condition analysis did not apply because the medical evidence supported the ALJ's finding that Zoeller sustained only a temporary strain, with no permanent harm to her degenerative cervical condition caused by the work incident . . . . Accordingly, the ALJ did not need to engage in an analysis pursuant to *Finley*.").